UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRENDAN RICHTER,  )
                  )
    Plaintiff,    )
                  )
    v.            )  Civil Case No. 18-00583 (RJL)
                  )
THE CATHOLIC UNIVERSITY )
OF AMERICA,       )
                  )
    Defendant.    )

**MEMORANDUM OPINION**
(February 5, 2019) [Dkt. # 8]

FILED
FEB - 7 2019
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Brendan Richter ("Richter" or "plaintiff") brought this action against The Catholic University of America ("CUA" or "defendant") for breaches of contract and the implied covenant of good faith and fair dealing. Plaintiff claims that CUA is contractually liable for its allegedly improper handling of his academic dismissal from CUA's Columbus School of Law ("CUA Law") during and after his first year as a law student. CUA moved to dismiss the action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Upon consideration of the pleadings and the relevant law, and for the reasons stated below, defendant's motion to dismiss is **GRANTED**, and this case is **DISMISSED**.

BACKGROUND

Plaintiff was enrolled as a law student at CUA Law for the 2016–2017 academic year. Am. Compl. ¶¶ 7–8 [Dkt. # 4]. He finished his fall semester with a 2.021 grade point average ("GPA"), which, under CUA Law's Academic Rules, required him to participate in the Academic Excellence Program ("AEP"). *Id.* at ¶¶ 9–11; CUA Law Academic Rules,

1

Sec. XXVIII [Dkt. # 8-3] (requiring first-year students in bottom 30 percent of class or who received a C- or lower to participate in the AEP by developing and implementing an approved "written individual academic plan").[1] Richter's first-semester GPA also put him at risk of running afoul of CUA Law's "general policy" that "[s]tudents who attain a cumulative grade point average at the end of their first year or thereafter of less than 2.5 will be excluded from CUA Law." CUA Law Academic Rules, Sec. VI.A, VI.B.1. The Academic Rules outline a procedure for excluded students to petition for readmission "upon a showing of special circumstances." *Id.* at Sec. VI.B.I.

On February 3, 2017, plaintiff signed an AEP Plan reflecting CUA Law's "concerns about [his] academic progress" and restating CUA Law's policy that students with a cumulative first-year GPA below 2.50 will be academically dismissed. AEP Plan [Dkt. # 8-2]. By signing the AEP Plan, Richter committed to, *inter alia*, "attend one of [his] professor's office hours and ask questions about [his] work once a week." *Id.*; Am. Compl. ¶ 13. According to the Amended Complaint, Richter did not meet regularly with his Constitutional Law professor because the professor's "office hours were frequently booked by other students and [the professor] would not make other arrangements to meet with"

---

[1] CUA attached several exhibits to its motion to dismiss, including CUA Law's Academic Rules, plaintiff's signed certification that he read the Academic Rules, and plaintiff's AEP Plan. *See* [Dkt. ## 8-2–8-4]. These documents are properly before me at this stage. *See, e.g., Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (on motion to dismiss, court may consider documents "appended to [a motion to dismiss] and whose authenticity is not disputed" if they are "referred to in the complaint and are integral" to a claim); *Navab–Safavi v. Broad. Bd. of Governors*, 650 F.Supp.2d 40, 56 n.5 (D.D.C. 2009) (considering exhibit to motion to dismiss "upon which the complaint necessarily relie[d]" and whose authenticity plaintiff did not dispute).

2

Richter "individually" because he viewed such meetings as "preferential treatment." Am. Compl. ¶¶ 45–47. Plaintiff thus could only attend "a group question and answer session" with the professor, "rather than [an] individual meeting." *Id.* ¶ 47. Richter alleges that because he (like his classmates) could not benefit from private sessions with the professor, he had "to devote a substantial amount of additional time to Constitutional Law," which "divert[ed] his attention from and undermin[ed] his efforts in other classes," leading to lower grades. *Id.* ¶ 49.

Plaintiff finished the spring semester with a 1.709 GPA, bringing his cumulative GPA down to 1.865. *Id.* ¶ 26. Because his GPA was below 2.50, CUA Law informed plaintiff in a June 9, 2017 letter that he would not be permitted to continue as a CUA Law student. *Id.* ¶ 27. About six weeks later, on July 24, Richter, through counsel, requested a letter from CUA Law stating that, despite his academic disqualification, he possessed the capacity to complete his legal education and be admitted to the bar, in accordance with American Bar Association ("ABA") Standard 501(c). *Id.* ¶¶ 29–32. CUA Law did not respond to Richter's request in writing; rather, CUA Law's counsel indicated to Richter's counsel that CUA Law did not intend to provide such a letter. *Id.* ¶¶ 34–35. Plaintiff alleges that he consequently "was unable to seek admission to an ABA-accredited law school for either the Fall 2017 or Spring 2018 semesters." *Id.* ¶ 36.

On March 15, 2018, Richter brought this action against CUA for breach of contract and breach of the implied covenant of good faith and fair dealing under D.C. law. *See* Compl. [Dkt. # 1]. He amended his complaint on June 5, 2018 to add new allegations regarding CUA Law's grading curve and additional allegations about his Constitutional

3

Law professor's office hours. *See* Am. Compl. On July 3, 2018, CUA moved to dismiss Richter's claims under Federal Rule of Civil Procedure 12(b)(6), *see* Def.'s Mot. to Dismiss [Dkt. ## 8, 8-1], and Richter filed his response on July 30, 2018, *see* Pl.'s Opp'n [Dkt. # 11]. CUA filed a reply in support of its motion on August 15, 2018. *See* Def.'s Reply [Dkt. # 14].

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible when the complaint allegations allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the standard does not amount to a "probability requirement," it does require more than a "sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient to state a claim. *Iqbal*, 556 U.S. at 678.

In resolving a Rule 12(b)(6) motion, the Court "assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor[.]" *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). In addition to the complaint's factual allegations, the Court may consider "documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose

4

authenticity is not disputed, if they are referred to in the complaint and integral to a claim." *Harris v. Amalgamated Transit Union Local 689*, 825 F.Supp.2d 82, 85 (D.D.C. 2011).

## ANALYSIS

In his Amended Complaint, plaintiff claims that he had an express and implied contract with CUA and that, by mishandling his academic dismissal, CUA breached that contract and the covenant of good faith and fair dealing implicit in it. *See* Am. Compl. ¶¶ 52–80. I will address these contentions in turn.

### I. Breach of Contract

Under D.C. law, "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).

The "general rule" in D.C. is that "the relationship between a university and its students is contractual in nature[.]" *Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007) (internal quotation marks omitted). That general proposition, however, does not absolve plaintiff of his burden as "[t]he party asserting the existence of an enforceable contract" to "prov[e] that the parties entered into an enforceable contract." *Ponder v. Chase Home Fin., LLC*, 666 F.Supp.2d 45, 48 (D.D.C. 2009) (citations omitted). "For a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations." *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009). "In the absence of a valid agreement, a breach of contract claim cannot be sustained."

5

*Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F.Supp.2d 89, 94 (D.D.C. 2004) (citation omitted).

Richter alleges that he and CUA had a valid contract "in connection with rights explicitly guaranteed by" CUA Law's Academic Rules, CUA's so-called "Grievance Procedures," and the AEP Plan. Am. Compl. ¶ 53. Although CUA apparently concedes that CUA Law's Academic Rules constitute an enforceable contract between it and Richter, *see* Def.'s Mot. to Dismiss at 6, "[t]he determination whether an enforceable contract exists" in the first instance "is a question of law" for the Court to resolve. *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005) (quoting *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 369 n. 9 (D.C. 1990)). Admittedly, whether the Academic Rules are a valid contractual agreement under D.C. law is a close question, and several of my colleagues on this Court have reached different conclusions on similar issues. It is true as a general matter that "the contract between a university and its students can include disciplinary codes and other communications from a university to its students." *Doe v. George Washington Univ.*, 321 F.Supp.3d 118, 123 (D.D.C. 2018) (Collyer, J.). In *Doe*, for example, the Court held that GW's Code of Conduct was a contract that bound the university because it set forth "clear procedures that impose[d] requirements" on GW, to which GW "expressed a clear intent to be bound." *Id.* at 124; *see Pride v. Howard Univ.*, 384 A.2d 31, 35 (D.C. 1978) (university code of conduct provisions constituted contract terms based on the university's "usual practices surrounding [the] contractual relationship").

The present case, however, is more akin to *Mosby-Nickens v. Howard Univ.*, 864 F.Supp.2d 93 (D.D.C. 2012) (Berman Jackson, J.). In that case, the Court held that the

6

plaintiff had failed to establish that Howard University's Graduate School Rules and Regulations were an enforceable contract because she identified neither "language in the document that demonstrate[d] Howard's intent to be bound by its terms," nor "any other indication, such as signatures of the parties, that would demonstrate such intent." *Id.* at 99; *see also id.* at 98 (collecting cases from other jurisdictions refusing "to construe university handbooks as binding, unchangeable contracts"); *Shinabargar v. Bd. of Trustees of Univ. of District of Columbia*, 164 F.Supp.3d 1, 29 (D.D.C. 2016) (university honor code was not an enforceable contract because it lacked an intent to be bound and mutuality of obligation).

Here, as in *Mosby-Nickens*, CUA Law's Academic Rules "appear[] to be intended as a means for [CUA Law] to communicate its expectations regarding academic conduct to its students," *not* an intentional effort by the university to bind itself to the Rules' provisions. 864 F.Supp.2d at 99; *see, e.g.*, CUA Law Academic Rules, J.D. Program Preface (Academic Rules are effective at "date of publication" and at any time, "the faculty may promulgate new rules, alter, or amend the existing Rules"); Academic Rules Certification Form [Dkt. # 8-4] (document certifying that Richter read the Academic Rules, signed only by Richter). Moreover, plaintiff does not allege that CUA Law's usual practice, or custom, in administering its Academic Rules serves as alternative proof of its intent to be bound by the terms contained therein. *Cf. Pride*, 384 A.2d at 35.[2] And the

---

[2] Although Richter alleges a "practice of permitting students with GPAs below 2.50 to" continue as students, Am. Compl. ¶ 66, it is not clear how that allegation is relevant to his contractual breach claim. Richter does not allege that his academic dismissal was itself a breach. To the contrary, he concedes that the AEP Plan contemplated academic

7

Amended Complaint does not explain how CUA Law's Academic Rules reflect obligations mutually assumed by the law school as well as its students. *Cf. Dyer*, 983 A.2d at 357 ("Mutuality exists when each party agrees to do something it otherwise is under no legal obligation to do, or to refrain from doing something it has a legal right to do."). The Academic Rules thus are not a valid and enforceable contractual agreement.

The remaining documents on which Richter relies present easier questions. The so-called "Grievance Procedures" are referenced only once in the Amended Complaint, and plaintiff provides no factual allegations regarding the nature of the document, its subject matter, or its terms. *See* Am. Compl. ¶ 53.[3] The AEP Plan, which is signed only by Richter, merely reflects the Academic Rules by restating Section VI's standard for academic exclusion and implementing Richter's preexisting obligations under Section XXVIII. The document imposes duties and obligations only on Richter; it neither indicates CUA's intent to be bound contractually nor obligates CUA to do anything. In other words, the AEP Plan "refers only to what the student must do." *Shinabargar*, 164 F.Supp.3d at 29. As such, Richter has failed to establish that either the Grievance Procedures or the AEP Plan are valid components of his alleged contract with CUA. This "complete failure of proof concerning an essential element of [plaintiff's] case . . . necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

disqualification of CUA Law students who failed "to achieve a cumulative GPA of 2.50 or higher" after their first year. *Id.* ¶ 12.

[3] CUA, for its part, denies that any such document, policy, or procedure exists. *See* Def.'s Mot. to Dismiss at 3 n.1, 6–7.

8

Even if Richter's contract claim did not fail out of the gate, it still must be dismissed because plaintiff has not adequately alleged that CUA had or breached any legal duty. Richter claims that CUA was contractually obligated and failed to: (1) guarantee his "right to meet regularly with" his Constitutional Law professor, "as proscribed by his [AEP] Plan"; (2) ensure that the professor "provided adequate instruction and materials to" make certain that he could sufficiently improve his cumulative GPA; and (3) refuse his spring tuition payment and prevent him from continuing as a law student in his second semester because CUA knew that "it was all but impossible for him" to achieve a cumulative 2.50 GPA. Am. Compl. ¶ 54.

For reasons already stated, CUA had no such obligations because it did not enter into an enforceable contract with Richter. But even if it had, the purported breaches are meritless, to say the least. Nothing in the Amended Complaint suggests that CUA agreed to guarantee plaintiff a contractual "right to meet regularly" with his professors, nor did CUA promise to micromanage its faculty members' schedules to give plaintiff the best chance possible to improve his grades. Instead, the AEP Plan reflects Richter's unilateral commitment to attend *one* of his professor's office hours each week and ask questions, to create his own outline and other work product for each course, and to complete at least one practice exercise for each course each week. *See* AEP Plan. It is laudable that CUA Law requires struggling students like Richter to pledge to make specific, measurable efforts aimed at improving their academic performance. But the notion that, in so doing, CUA Law somehow bound itself contractually borders on the absurd.

For these reasons, plaintiff has failed to state a claim for breach of contract under Rule 12(b)(6).

**II.     Breach of Implied Covenant of Good Faith and Fair Dealing**

Richter also claims that CUA breached the covenant of good faith and fair dealing implicit in the alleged contract "by making it impossible for [him] to realize the benefit of his contract and by permitting its agents to act in bad faith and in a manner that interfered with [his] contractual expectations." Am. Compl. ¶¶ 62–63. All contracts contain an implied covenant of good faith and fair dealing, which prevents either party from "do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Nugent v. Unum Life Ins. Co. of Am.*, 752 F.Supp.2d 46, 56 (D.D.C. 2010). To survive a motion to dismiss for breach of the implied covenant, a plaintiff must allege facts to show that defendant "has taken steps, or refused to take steps, which ultimately had the effect of destroying or injuring the right . . . to receive the fruits of the contract." *Id.* at 57 (internal quotation marks omitted).

Having failed to establish an enforceable contract, plaintiff once again stumbles out of the starting block. *See, e.g.*, *Mero v. City Segway Tours of Washington, DC, LLC*, 826 F.Supp.2d 100, 107 (D.D.C. 2011) ("the absence of a contract alone is sufficient to defeat [an] implied covenant claim"); *Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F.Supp.2d 89, 96 (D.D.C. 2004) (dismissing implied covenant claim where plaintiff failed to allege "any express or implied agreement that could give rise to a breach of good faith and fair dealing"). Even with a contract, however, Richter would fare no better. "[T]o show that a university breached the implied covenant of good faith and fair dealing, a

10

plaintiff must allege 'either bad faith or conduct that is arbitrary and capricious.'" *Chenari v. George Washington Univ.*, 847 F.3d 740, 745 (D.C. Cir. 2017) (quoting *Wright v. Howard University*, 60 A.3d 749, 754–55 (D.C. 2013) (internal quotation marks omitted)). Richter asserts specifically that CUA "singled [him] out . . . for disparate treatment" by allowing its professors to interfere with his contractual expectations, by dismissing him based on his academic performance while allowing other similarly situated students to continue, and by failing to provide him a letter attesting to his ability to complete his legal studies and pass the bar, thereby holding Richter's future "hostage." Am. Compl. ¶¶ 62–74.

These allegations are far from enough to show that CUA acted arbitrarily, or in bad faith. First, there is no factual basis from which to conclude that any CUA Law professor acted improperly. Second, even taking as non-conclusory fact plaintiff's attrition-based conjecture that CUA "exclude[s] few if any students for academic reasons," Am. Compl. ¶ 67, the Academic Rules expressly provide for readmission, including immediate readmission with a faculty waiver, *see* CUA Law Academic Rules VI.B.1–2. There is nothing in the Amended Complaint suggesting that other CUA Law students, like plaintiff, fell below the academic disqualification threshold and did not seek readmission, but, unlike plaintiff, were permitted to continue into their second year. And even if CUA Law did, as a general practice and contrary to the Academic Rules, allow students with sub-2.50 GPAs to continue beyond their first year, there is no reason to believe that such a custom would apply to someone like Richter whose academic performance *declined* in his second semester, even after implementation of the AEP Plan. Third, and for the same reasons,

11

plaintiff cannot explain how CUA Law acted improperly by refusing to provide a "letter . . . indicating that [he] had the capacity to complete a legal course of study." Am. Compl. ¶ 30. It is obvious from the pleadings that CUA Law did not believe that to be true; after all, the school disqualified Richter based on his demonstrated *lack* of academic capacity. It would be nonsensical to infer ill will or caprice from CUA Law's refusal to make a false representation to its peer institutions.[4]

Moreover, in the present context the "concepts of academic freedom and academic judgment are so important that courts generally give deference to the discretion exercised by university officials." *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006). Under this deferential standard, I am not able to upset an institution's decision to dismiss a student unless the student establishes that the decision "is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999) (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)). The Academic Rules make clear that any student with a first-year cumulative GPA below 2.50 would "be excluded from CUA Law." CUA Law Academic Rules, Sec. VI.A. Plaintiff's cumulative GPA after his first year was 1.865, considerably lower than the threshold for academic disqualification. Am. Compl. ¶ 26. The facts in the Amended Complaint are "not nearly enough to establish evidence from which a fact finder

---

[4] Notably, as the Amended Complaint makes clear, the ABA standard in effect at the time did not so much as reference a letter from the disqualifying school, much less obligate CUA Law to provide one. *See* Am. Compl. ¶¶ 29–30.

could conclude that there was no rational basis for [CUA Law's] decision" to dismiss Richter. *Bain v. Howard Univ.*, 968 F.Supp.2d 294, 300 (D.D.C. 2013) (alterations and internal quotation marks omitted). As such, I will not "substitut[e] [my] judgment improperly for the academic judgment of the school." *Chenari*, 847 F.3d at 745 (quoting *Wright*, 60 A.3d at 754–55).

## CONCLUSION

For the foregoing reasons, CUA's motion to dismiss is hereby **GRANTED**, and this case is **DISMISSED** with prejudice. A separate order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge